IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OT, LLC, et al.                                 *

      Plaintiffs,                          *

v.                                              *     Civil Action No. GLR-17-2812

HARFORD COUNTY,                                 *
MARYLAND, et al.,
                                                *

      Defendants.                          *

                                           *    *    *

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiffs OT, LLC ("OT"), Gemcraft

Homes, Inc. ("Gemcraft"), Shades and Springs, Inc. ("S&S"), and Ajaz Khan's Motion for

Partial Summary Judgment and Request for Hearing ("Plaintiffs' Motion") (ECF No. 196)

and Defendants Harford County, Maryland (the "County"), County Executive Barry

Glassman, County Director of Administration Billy Boniface, County Attorney Melissa

Lambert, and County Director of Public Works Joseph J. Siemek's (collectively, the

"County Defendants") Motion for Summary Judgment and Opposition to Plaintiffs'

Motion for Partial Summary Judgment ("County Defendants' Motion") (ECF No. 200).[1]

---

[1] Also pending are Third-Party Defendant Fidelity and Deposit Company of
Maryland's ("F&D") Motion to Dismiss Counts I, II, and IV of the Third-Party Complaint
(ECF No. 155) and Motion to Stay Third-Party Complaint (ECF No. 179); Third-Party
Defendant Old Trail Partnership, LLC's ("OTP") Motion for Judgment on the Pleadings
or, in the Alternative, for Summary Judgment (ECF No. 194); Fourth-Party Plaintiff OTP's
Motion for Summary Judgment (ECF No. 195); Plaintiffs/Fourth-Party Defendants OT and
Gemcraft's Memorandum of Law in Opposition to Fourth-Party Plaintiff OTP's Motion

The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will deny Plaintiffs' Motion and grant in part and deny in part County Defendants' Motion.

## I.    BACKGROUND[2]

At the center of this dispute is Old Trails Subdivision, a residential subdivision in Harford County, Maryland ("Old Trails" or the "Property"). Although this litigation primarily involves religious discrimination that allegedly took place after OT acquired Old Trails in 2016, the Court's inquiry depends in part on certain facts arising prior to that time. As such, the Court provides a brief history of the Property below.

## A.    <u>Initial Development of the Property</u>

In 2005, Old Trails Partnership, LLC ("OTP"), the original owner of Old Trails, sought to develop Old Trails into townhomes with Tousa Homes, Inc. ("Tousa") as its partner. To do so, OTP entered into a Storm Water Management Maintenance Agreement and a Subdivision Agreement with the County. (Stipulation of Facts ["Stip."] at 1, ECF No. 133-1). The County approved the Storm Water Management ("SWM") plan in

---

for Summary Judgment and in Support of their Motion for Summary Judgment (ECF No. 198); and Defendants Delegates Richard K. Impallaria and Patrick L. McDonough's Motion for Summary Judgment (ECF No. 199). The Court will resolve these Motions in separate opinions.

[2] Unless otherwise noted, the facts outlined here are set forth in Plaintiffs' Amended Complaint (ECF No. 40). To the extent the Court discusses facts that Plaintiffs do not allege in their Amended Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

September 2005, and renewed its approval in March of the following year. (Id.). In 2006, OTP, Tousa, and Harford County entered into a Public Works/Maintenance Agreement for Roads and a Public Works Agreement for Sidewalks (collectively, the "PWAs") and a Public Works On-Site Utility Agreement and a Public Works Off-Site Utility and Recoupment Agreement (collectively, the "PWUAs"). (Id. at 1–2). In connection with the PWAs, PWUAs, and SWM plan, Tousa procured and posted bonds from Fidelity and Deposit Company of Maryland ("F&D") to secure the required infrastructure improvements. (Id. at 1).

Between 2007 and 2008, Tousa built four townhomes on the Property and sold them to individual homebuyers. (Id. at 1). Prior to those sales, OTP and Tousa installed the base course of asphalt on the road, storm drains, and water and sewer infrastructure, including water and sewer mains and a pumping station, and began grading and construction of the SWM facilities. (See Ensor Dep. Jan. 9, 2019 at 79:13–85:15, ECF No. 200-15). OTP and Tousa did not, however, install the sidewalks or road's top coat, complete the SWM facilities, or reach final acceptance of the on-site water and sewer mains because that work would typically be completed only after the houses were built. (See id.).

Before completing the remaining work on Old Trails, Tousa filed for bankruptcy in early 2008. (Stip. at 1). Later that year, Senior Assistant County Attorney Margaret Hartka emailed Rose Baker, a management assistant in the County's Department of Public Works ("DPW"), and other County employees recounting a conversation Hartka had with OTP's counsel about Old Trails. (Defs.' Mot. Summ. J. & Opp'n Pls.' Mot. Part. Summ. J.

["Defs.' Mot."] Ex. 3 ["Hartka Email"], ECF No. 200-5). Hartka explained that she told OTP "the County would allow the existing bonds, issued with Tousa as the principal, to remain in place and [would] process the new SWM permit." (Id.). Hartka said she "warned" OTP, however, that "if the premiums are not paid on the existing bonds and the bonding company sends us a notice of default, we will claim as much as we need to in order to safeguard the situation of the four existing homes . . . but would let the remainder of the bonds go and simply obtain new PWAs and new bonds from any developer who took over the project." (Id.).

Between 2008 and 2016, OTP engaged in limited development-related activities relating to Old Trails, including submitting the SWM plan for reapproval and applying for new SWM permits in 2008, 2012, and 2015. (Defs.' Mot. Ex. 15 ["SWM Plan"], ECF No. 200-17).

**B.** **OT's Purchase of the Property**

In March 2016, William Luther, Gemcraft's president, expressed interest in purchasing Old Trails from OTP. (Defs.' Mot. Ex. 16 ["Mar. 14, 2016 Dale Hevesy Email"], ECF No. 196-18). The next month, one of Luther's business associates informed Luther that the SWM plans may need to be redesigned and reapproved in the event construction was not complete by May 2017. (Defs.' Mot. Ex. 18 ["April 5, 2016 Dennis Reimann Email"] at 1, ECF No. 200-20; see also Luther Dep. Jan. 11, 2019 at 27:14–35:15, ECF No. 200-19). On May 18, 2016, Luther executed a Letter of Intent on behalf of Gemcraft, indicating that the "Buyer will assume the Property 'As-Is' and will assume all

current and remaining developer obligations." (Defs.' Mot. Ex. 20 ["Letter of Intent"] at 2, ECF No. 200-22).

OTP entered into a Purchase and Sale Agreement (the "Purchase Agreement") with Gemcraft on August 17, 2016. (Stip. at 3). The Purchase Agreement provided that OTP was not transferring "any development bonds . . . held by or posted with any Governmental Authority . . . or other third party with respect to any improvement, subdivision or development obligations concerning [Old Trails]." (Defs.' Mot. Ex. 22 ["Purchase Agreement"] § 1(e), ECF No. 200-24). The Purchase Agreement also released OTP from all responsibility for complying with or satisfying any governmental conditions of approval or requirements that remain unsatisfied with respect to the Property. (Purchase Agreement § 23(D)). Further, the Purchase Agreement acknowledged "that if the development work approved under the current construction drawings for the Property has not been completed on or prior to May 4, 2017 then the remaining undeveloped portion of the Property will be subject to the requirements set forth in the current storm water management regulations." (Purchase Agreement § 11.2).

By October 2016, community members began expressing concerns about the sale and proposed development of the Property. On October 4, 2016, a community advisory board member notified former County Councilman Dion Guthrie about "news that Old Trails will be sold on October 18th [to] a Muslim Group[,]" to which Guthrie replied, "Get the Councilman to put in [an] amendment to tighten it up." (Pls.' Mot. Part. Summ. J. & Req. Hear. ["Pls.' Mot."] Ex. 23 ["Guthrie Email"], ECF No. 196-25). On October 5, 2016,

Steven Weaver, who lived near Old Trails, contacted the office of then-Councilman Mike Perrone, Jr. "to report a possible suspicious situation" about Old Trails after unsuccessfully attempting to report his concerns to the Department of Homeland Security. (Pls.' Mot. Ex. 20 ["Oct 5, 2016 Sheriff's Department Email"], ECF No. 196-22). Weaver also spoke directly with Glassman about the issue over the phone. (See Pls.' Mot. Ex. 22 ["Killian-Glassman Email"], ECF No. 196-24).

## C.   **Permitting Process**

Beginning in October 2016, Gemcraft was in frequent contact with the County about acquiring permits for the Property. In mid-October 2016, DPW informed Gemcraft that "there are currently bonds for sediment control and stormwater which will need to be replaced" and, as a result, the County "would like to wait until the plans are approved because the bonding amounts will likely need to be adjusted." (Defs.' Mot. Ex. 34 ["Oct. 18, 2016 Email"], ECF No. 200-36). Nonetheless, the County Department of Planning and Zoning ("DPZ") issued five building permits to Gemcraft on November 16, 2016. (Stip. at 3–4). Several months later, DPW requested that Gemcraft submit a "new set of plans" for six storm water permits and the grading permit, noting that the permits were set to expire on June 24, 2017 and July 16, 2017, respectively. (Defs.' Mot. Ex. 35 ["Mar. 29, 2017 Email"], ECF No. 200-37).

On April 5, 2017, OT entered into an Option Agreement with S&S, a non-profit organization associated with the Ahmadiyya Movement in Islam, Inc., USA ("AMCUSA"). (Stip. at 4). The Option Agreement permitted S&S to purchase as many as

forty-five lots in the Old Trails Subdivision. (June 4, 2018 Hearing Transcript ["Tr. I"] at 65, ECF No. 128). The Option Agreement also obligated OT to seek approval for the construction of a community center on the Property that could be used by residents of Old Trails as a gathering place for prayer and other activities. (Id.). To celebrate the Option Agreement, S&S and Gemcraft held a groundbreaking ceremony at the Property on April 22, 2017. (Id. at 108–09). After the ceremony, AMCUSA posted to its website photographs depicting Ahmadi men dressed in culturally traditional attire praying over the site. (Id.; Pls.' Mot. Ex. 18 ["Photos of Groundbreaking Ceremony"], ECF No. 196-20).

DPW awarded Gemcraft a grading permit for the Property on May 9, 2017. (Defs.' Mot. Ex. 39 ["Grading Permit"], ECF No. 200-41). DPZ then issued four building permits to Gemcraft on May 10, 2017, and an additional four permits on May 11, 2017. (Stip. at 4–5). On May 12, 2017, Baker, the DPW assistant, emailed Gemcraft to explain that, although the County had "recently issued a builder phase grading permit . . . [and] approved several building permits" for the Property, "the storm water permits [and] public works agreements (currently under Old Trail Partnership LLC [and] Tousa Homes Inc) will also need to be permitted [and] bonded under OT LLC." (Defs.' Mot. Ex. 40 ["May 12, 2017 Baker-Luther Email"] at 2, ECF No. 200-42). Further, Baker cautioned Gemcraft that "the County will no longer approve any future building permits until this is resolved." (Id.). Despite this warning, DPZ issued one additional building permit to Gemcraft on May 24, 2017. (Stip. at 5).

Between June and August 2017, County employees communicated internally and with OT and Gemcraft about permitting requirements for Old Trails. On July 10, 2017, Tina Rawl, the permits review supervisor in DPW's Division of Water and Sewer, informed a colleague that she could not sign off on a water and sewer hook-up worksheet for the lots on the Property that the County had permitted on November 16, 2016 because DPW is "requiring the developer to enter into a new PWA and post new bonds . . . ." (Defs.' Mot. Ex. 42 ["July 10, 2017 Rawl Email"], ECF No. 200-44). Rawl also expressed her belief that "we need to require a new PWUA and new bonds as well." (Id.).

On July 17, 2017, upon learning that Gemcraft had submitted five new building permits, Rawl instructed several employees who had been reviewing permit applications for the Property that "until the bonds are reposted and a new PWUA is executed[,] we should not be approving building permits." (Defs.' Mot. Ex. 43 ["July 17, 2017 Rawl Email"], ECF No. 200-45). Later that day, Rawl notified Luther of the same: Gemcraft would need to submit a new PWUA and replacement bond for the water and sewer utilities in order for DPW to approve any future permits. (Pls.' Mot. Ex. 27 ["July 17, 2017 Rawl-Luther Email"], ECF No. 196-29; Defs.' Mot. Ex. 44, ECF No. 200-46). Then, on July 18, 2017, following up on her May 12, 2017 email, Baker informed Luther that OT needed to renew and bond the storm water permits under OT's name, update the SWM plans, and reassign and bond the PWAs for roads and sidewalks to OT. (Pls.' Mot. Ex. 28 ["July 18, 2017 Baker-Luther Email"], ECF No. 196-30; Defs.' Mot. Ex. 45 ["July 18, 2017 Luther-Baker Email"], ECF No. 200-47). Luther replied to Rawl and Baker with similar messages,

explaining that "Old Trails is a community of finished lots, completed and bonded by another developer" and that Luther's engineer would be in contact "to get an understanding as to what you are requesting." (Defs.' Mot. Ex. 46 ["July 18, 2017 Luther-Rawl Email"], ECF No. 200-48; July 18, 2017 Luther-Baker Email at 1).

On July 19, 2017, Rawl forwarded the email chain with Luther to Siemek, Hartka, and two senior employees of DPW's Water and Sewer Division, writing that she "was following the procedure we/County has required on other developments [where] the original developer has abandoned the project" and listing two examples. (Defs.' Mot. Ex. 47 ["July 19, 2017 Rawl Email"], ECF No. 200-49). In her email, Rawl also flagged the portion of the Purchase Agreement providing that OT "hereby assumes all of the obligations of [OTP] first accruing after the date of this Agreement" including "[a]ll rights and appurtenances[,]" explaining that "[water and sewer] is often referred to in this manner." (Id.). Rawl followed up with Luther on July 20, 2017, offering to discuss the issue at any time, to which Luther responded that "a meeting with Billy Boniface will be necessary." (Defs.' Mot. Ex. 48 ["July 20, 2017 Luther-Rawl Email"], ECF No. 200-50).

While Plaintiffs attempted to obtain permits from the County, residents from neighboring communities continued to oppose the Old Trails project. From around June 20, 2017 to July 4, 2017, Weaver made several calls inviting Glassman, Boniface, and other County officials to attend a public meeting with Gemcraft set for July 10, 2017 to address the community's concerns about the Property. (See Pls.' Mot. Ex. 24 ["July 3, 2017 Killian-Boniface Email"] at 2, ECF No. 196-26; Pls.' Mot. Ex. 25 ["July 20, 2017 Killian Email"]

at 2, ECF No. 196-27). Around the same time, local real estate agent Gina Pimentel contacted County officials about her concerns and shared inflammatory information about the Property on her social media pages. (See June 5, 2018 Hearing Transcript ["Tr. II"] at 82–159, ECF No. 131). Additionally, in July 2017, after receiving several e-mails and phone calls about Old Trails from constituents, Defendant Delegate Patrick L. McDonough ("Del. McDonough") had a private conversation with Glassman in which he told Glassman to "get your County Attorney [Lambert] to investigate this. . . and do not issue any permits." (See Preliminary Injunction Hearing Ex. 163 ["Audio Recording"] at 48:52; Tr. II at 18–20).

Lambert, Boniface, Siemek, and Hartka met privately on August 2, 2017, to discuss the Property. (See Pls.' Mot. Ex. 29 ["Aug. 2, 2017 Siemek-Lambert-Hartka Email"], ECF No. 196-29). On August 3, 2017, Siemek sent an email to Boniface, Lambert, and Hartka, stating, "[p]er our meeting, here are the general steps required in the various areas of DPW to be able to approve building permits in a development that is taken over by a new owner." (Defs.' Mot. Ex. 49 ["Aug. 3, 2017 Siemek Email"], ECF No. 200-51). Siemek's email also referenced the requirement that "[i]f the SWM facilities on the site were not constructed and certified to be as-built by May 4, 2017, new SWM design, calculations and plans will need to be submitted in compliance with the current MDE criteria." (Id. at 2).

On August 14, 2017, at Plaintiffs' request, Lambert, Boniface, and Siemek met with Luther and counsel for OT, Gemcraft, and S&S to discuss the County's refusal to issue more building permits. (Stip. at 5; Tr. II at 56). Boniface stated during this meeting that

"[w]e have to cross our t's and dot our i's here because of the mosque issue" and the "greater scrutiny over what we are doing with this project." (June 7, 2017 Hearing Transcript ["Tr. IV"] at 99, ECF No. 130). Additionally, Lambert told Luther that Gemcraft would need to post new bonds for the project because Lambert could not find Tousa's original bonds or, alternatively, the bonds were expired or canceled. (Tr. I at 123; Tr. II at 58; June 6, 2017 Transcript ["Tr. III"] at 206–07, ECF No. 129). In response, Luther explained that he had copies of the bonds and offered to send them to Lambert. (Tr. I at 124). Following the meeting, counsel for OT, Gemcraft, and S&S sent Lambert a disc containing copies of the bonds and followed up with a letter explaining that the bonds were still in place. (Pls.' Mot. Ex. 36 ["Aug. 16, 2017 Jay Young Ltr."], ECF No. 196-38; Pls.' Mot. Ex. 37 ["Aug. 23, 2017 Jeffrey Scherr Ltr."], ECF No. 196-39).

After the August 14, 2017 meeting, County employees attempted to collect additional information and documentation relating to the existing bonds. Hartka emailed Baker asking for the bonds on August 15, 2017. (Tr. III at 123–24). The following day, an administrative assistant from F&D provided the County with a printout entitled "Agency Bill Premium Advice," purporting to show that the bonds had been canceled. (Pls.' Mot. Ex. 40 ["Aug. 16, 2017 F&D Email"], ECF No. 196-42). When Lambert and Boniface met again with Luther and counsel for OT, Gemcraft, and S&S on August 28, 2017, Lambert presented the printout from F&D and stated that the previous bonds "aren't any good." (Tr. I at 126). Lambert later admitted that the printouts did not appear to be cancellation notices. (Tr. III at 213).

Plaintiffs and County Defendants also continued to disagree about the County's permitting requirements after the August 14, 2017 meeting. On August 15, 2017, Rawl emailed Luther a draft of the PWUA for the Property, asking him to review and approve the document. (Defs.' Mot. Ex. 51 ["Aug. 15, 2017 Rawl-Luther Email"], ECF No. 200-53). On August 16, 2017, Siemek, who had been copied on Rawl's email from the previous day, warned Rawl to "expect some pushback like you did before." (Defs.' Mot. Ex. 52 ["Aug. 15, 2017 Siemek-Rawl Email"], ECF No. 200-54). Later that day, Luther replied to Rawl, writing: "I had a meeting with Billy Boniface and Joe Siemek on Monday 8/14 to resolve these issues. You have a PWUA and a bond posted on this job with the developer. Was this email generated before the meeting or as a result of the meeting?" (Defs.' Mot. Ex. 53 ["Aug. 16, 2017 Luther-Rawl Email"], ECF No. 200-55). Also on August 16, 2017, Baker forwarded Siemek the 2008 email from Hartka in which Hartka explained that the County would "obtain new PWAs and new bonds from any developer who took over the project." (Defs.' Mot. Ex. 54 ["Aug. 16, 2017 Baker-Siemek Email"] at 2, ECF No. 200-56). Baker explained to Siemek, "[i]t was my understanding that if a new Developer were to take over the project, they would need to update all of the plans, permits & bonds in the new Developer name." (Id. at 1).

On September 5, 2017, Lambert sent a letter to counsel for OT and Gemcraft setting forth "a list of the steps required for the Old Trails property to obtain building permits for additional lots." (Defs.' Mot. Ex. 55 ["Sept. 5, 2017 Lambert Ltr."] at 1, ECF No. 200-57). The letter instructed OT that it needed to submit new PWAs and PWUAs, update the SWM

plan to comply with current stormwater management regulations, and obtain new bonds for the PWAs, PWUAs, and SWM permits. (Id.). The letter stated that "[u]pon verification by the County of these finalized documents, building permits for additional lots may be obtained." (Id.). To date, OT and Gemcraft have not submitted new PWAs, PWUAs, SWM plan, bonds, or any other documents the County requested in the September 5, 2017 letter.

## D.    Approval of Community Center

In the midst of the permitting and bonding discussions between Plaintiffs and County Defendants, OT also sought approval to build a community center on the Property where residents could engage in religious activity, such as prayer, and non-religious activities, such as celebrations or educational programs. (Tr. I at 67–69). DPZ granted preliminary approval of the plan for the community center on July 20, 2017. (Stip. at 5). Shortly thereafter, S&S shared on its website that the County had approved its "Community Center/Mosque." (Pls.' Mot. Ex. 49 ["Website Printout"], ECF No. 196-51). Then, on July 25, 2017, Lambert sent OT and Gemcraft a letter cautioning that "the community center shall only be used by the property owners living within the community and shall not be open to the public." (Pls.' Mot. Ex. 1 ["July 25, 2017 Lambert Ltr."], ECF No. 196-3). Further, the letter stated that "[a]n institutional use, such as a mosque or a house of worship of any kind, is not permitted on the property." (Id.). By July 27, 2017, S&S had removed the mention of the "Community Center/Mosque" from its website. (See Pls.' Mot. Ex. 3 ["July 27, 2017 Glassman Email"], ECF No. 196-5). OT then replied to the County on July 31, 2017, explaining that the community center "is intended to be used by the members of

13

the Old Trails community and is not to be open to the public." (Defs.' Mot. Ex. 66 ["July 31, 2017 OT Reply Ltr."], ECF No. 200-68). The County ultimately approved the plan for the community center on October 6, 2017, and the plat was recorded on October 10, 2017. (Pls.' Mot. Ex. 61 ["Revised Community Center Plat"], ECF No. 200-63). Although final approval "typically" takes "four to six weeks," (Killian Dep. Jan. 16, 2019 at 125:16–126–2, ECF No. 196-4), it took the County approximately two-and-a-half months to approve OT's plan, (see Stip. at 5).

## E.  Community Hearings

Even after the County issued the September 5, 2017 letter, community members continued to rally in opposition to the proposed development of the Property. On September 7, 2017, Gina Pimentel and her husband Jorge Pimentel (collectively, the "Pimentels") hosted a public meeting with Del. McDonough and Delegate Richard K. Impallaria ("Del. Impallaria"). At this meeting, Del. McDonough disclosed that he had directed Glassman not to issue any permits for the Property and said that the proposed development of the Property could be related to Sharia law or Sharia financing. (See Audio Recording at 48:52). The following day, the Delegates sent a letter on House of Delegates letterhead to Glassman expressly "requesting that no more permits be issued and that no further occupancy permits be granted until a full investigation has been completed." (Pls.' Mot. Ex. 43 ["Sept. 8, 2017 Impallaria-Glassman Email"], ECF No. 196-45).

On September 11, 2017, Boniface, Del. Impallaria, and others attended a community advisory board meeting. (See Pls.' Mot. Ex. 7 ["Sept. 11, 2017 Joppatowne

Community Advisory Board Meeting Minutes"], ECF No. 196-9). Prior to this meeting, Glassman emailed Del. Impallaria, indicating that Boniface would let the attendees of the meeting know "what we have done." (Pls.' Mot. Ex. 8 ["Sept. 11, 2017 Glassman-Impallaria Email"], ECF No. 196-10). Indeed, during the meeting, Boniface announced to the crowd that "[t]hey can build the houses but they can't put anybody in them." (Pls.' Mot. Ex. 9 ["Sept. 12, 2017 Article"], ECF No. 196-11).

F.    **Procedural History**

OT and Gemcraft sued County Defendants, as well as Dels. McDonough and Impallaria, on September 21, 2017. (ECF No. 1). On December 1, 2017, OT and Gemcraft, joined by S&S and Khan, filed a seventeen-count Amended Complaint, alleging: violations of the Free Exercise, Establishment, and Freedom of Association Clauses of the First Amendment to the U.S. Constitution (Counts I–III); a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution under 42 U.S.C. § 1983 (2018) (Count IV); deprivation of substantive due process in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution under § 1983 (Count V); violations of the non-discrimination and substantial burden provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (2018) (Counts VI and VII); violation of Articles 24 and 26 of the Maryland Declaration of Rights (Counts VII and IX); discrimination in the sale of housing in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, et seq. (2018) (Count X); interference, coercion, or intimidation in violation of the FHA (Count XI); racial discrimination under 42 U.S.C. § 1981 (2018)

15

(Count XII); deprivation of rights under 42 U.S.C. § 1982 (2018) (Count XIII); conspiracy to interfere with civil rights under 42 U.S.C. § 1985 (2018) (Count XIV); neglect to prevent conspiracy under 42 U.S.C. § 1986 (2018) (Count XV); and tortious interference with contractual and prospective business relations (Count XVII). (Am. Compl. ¶¶ 100–209, 220–227, ECF No. 40). Plaintiffs seek judicial review of the County's administration actions (Count XVII), as well as declaratory, injunctive, and monetary relief. (Id. at 41–107).

On October 10, 2017, OT and Gemcraft filed a Motion for Preliminary Injunction against County Defendants, (ECF No. 19), and on December 4, 2017, S&S and Khan moved to join OT and Gemcraft's Motion, (ECF No. 43). On June 22, 2018, after a five-day evidentiary hearing and oral argument, the Court granted Plaintiffs' Motion for Preliminary Injunction and ordered County Defendants to issue permits for fourteen newly constructed homes in the Old Trails Subdivision. (ECF No. 133).

On February 19, 2019, Plaintiffs filed a Motion for Partial Summary Judgment and Request for Hearing. (ECF No. 196). County Defendants filed their Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 200). Plaintiffs filed a Response on April 2, 2019. (ECF No. 205). County Defendants filed a Reply on April 23, 2019. (ECF No. 212).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

In reviewing a motion for summary judgment, the Court views the facts in a light

most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its "affirmative obligation" to "prevent factually unsupported claims and defenses" from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). If the evidence presented

by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249–50.

**B.      Analysis**

Plaintiffs move for partial summary judgment on their claims arising under the U.S. Constitution—Free Exercise (Count I), Establishment (Count II), Freedom of Association (Count III), Equal Protection (Count IV), and Substantive Due Process (Count V)—as well as RLUIPA (Counts VI and VII), urging the Court to conclude that County Defendants' actions were motivated by anti-Muslim pressure from community members. In response, County Defendants move for summary judgment as to all of Plaintiffs' claims, arguing that County Defendants' actions were motivated by the relevant zoning requirements, not by religious animus. The Court considers each claim in turn.

**1.      Ripeness**

As a preliminary matter, the Court must address County Defendants' argument that Plaintiffs' claims should be dismissed because they are not ripe. County Defendants argue that Plaintiffs' claims are not ripe because Plaintiffs have not formally requested Richard S. Truitt, the County's Deputy Director of the Department of Inspections, Licenses and Permits, to issue building permits, or petitioned the Building Code Board of Appeals to review the County's decision to withhold building permits as required under the 2015 International Building Code ("IBC"). Plaintiffs counter that the IBC is inapplicable here and, in any event, Plaintiffs' claims are ripe for review because the County issued its final

decision denying the permits in Lambert's September 5, 2017 letter. The Court agrees with Plaintiffs.

The IBC, the County adopted by reference at Harford County Code ("HCC" or the "County Code") § 82-1, is a uniform building code that pertains "to the construction, alteration, relocation, enlargement, replacement, repair, equipment, use and occupancy, location, maintenance, removal and demolition of every building or structure or any appurtenances connected or attached to such buildings or structures." IBC § 101.2. Section 113.1 of the IBC creates a "board of appeals" that is responsible for "hear[ing] and decid[ing] appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this code . . . ." (emphasis added). Under the plain reading of the IBC, the Building Code Board of Appeals is tasked with reviewing permitting decisions made pursuant to the provisions of the IBC. Here, however, County Defendants have never asserted that Plaintiffs' permits were denied for failure to comply with IBC requirements. As such, the IBC is inapplicable to Plaintiffs' claims, and Plaintiffs did not need to seek review by Truitt or the Building Code Board of Appeals in order for their claims to be ripe for the Court's review.

To the extent County Defendants argue that Plaintiffs claims are not ripe because Plaintiffs failed to exhaust other administrative remedies, this Court has repeatedly concluded that plaintiffs generally "do not need to exhaust administrative remedies before bringing their federal constitutional, RLUIPA, or FHA claims." Congregation ARIEL Russian Cmty. Synagogue, Inc. v. Baltimore Cty., No. CV GLR-17-910, 2018 WL

1535494, at *9 (D.Md. Mar. 28, 2018); see also Bryant Woods Inn, Inc. v. Howard Cty., 124 F.3d 597, 601 (4th Cir. 1997); Hunt Valley Baptist Church, Inc. v. Baltimore Cty., No. CV ELH-17-804, 2017 WL 4801542, at *21 (D.Md. Oct. 24, 2017). However, while "exhaustion is not required before pursuing a RLUIPA claim, . . . 'there must be some degree of finality before a RLUIPA claim is ripe for review.'" Congregation ARIEL, 2018 WL 1535494, at *9 (quoting Hunt Valley, 2017 WL 4801542, at *21).

Here, the County's decision had a sufficient degree of finality. The September 5, 2017 letter from Lambert identified "steps required . . . to obtain building permits for additional lots" at Old Trails and specifically stated that the County would not issue additional building permits until OT or Gemcraft complied with those steps. (Sept. 5, 2017 Lambert Ltr. at 1). Further, although County Code provides that applicants may appeal the denial of a zoning permit to Boniface in his role as the County's Director of Administration, see HCC § 214-45, Boniface stated he was unwilling to have any additional meetings with counsel for S&S and affirmed that the County's "position would not change," (Boniface Aff. ¶ 12, 13, ECF No. 29-14). Because the County's decision here had "some degree of finality," see Congregation ARIEL, 2018 WL 1535494, at *9, Plaintiffs' claims are ripe for review.

2. **First Amendment (Counts I–III), Equal Protection (Count IV), and RLUIPA Non-discrimination (Count VI)**

Because Counts I–III, IV, and VI each require an element of discriminatory intent, the Court analyzes these claims together.

The First Amendment to the United States Constitution "forbids the adoption of laws designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest." Booth v. Maryland, 327 F.3d 377, 380 (4th Cir. 2003) (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993)); see also U.S. Const. amend. I. The First Amendment "extends beyond facial discrimination" and "protects against governmental hostility which is masked as well as overt." Id. (quoting Lukumi Babalu Aye, 508 U.S. at 534).

Relatedly, RLUIPA's non-discrimination provision states that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). This Court has found that RLUIPA's nondiscrimination provision incorporates elements of an equal protection analysis. Hunt Valley, 2017 WL 4801542 at *29. In the context of equal protection regarding zoning, the Fourth Circuit has explained: "To prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another." Id. (quoting Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 819 (4th Cir. 1995)). Additionally, although "an equal protection claim must be rooted in an allegation of unequal treatment for similarly situated individuals, a showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim." Id. at *30 (quoting Sylvia, 48 F.3d at 825). Ultimately, the plaintiff must establish that any difference in treatment was the result of intentional or purposeful discrimination. Id. (citing Sylvia,

48 F.3d at 819); <u>see also</u> <u>Reaching Hearts Int'l, Inc. v. Prince George's Cty.</u>, 584 F.Supp.2d 766, 781 (D.Md. 2008) ("To demonstrate an Equal Protection claim successfully in the Fourth Circuit, a plaintiff must show intentional or purposeful discrimination; it is not enough to prove that a benefit was denied to one party while conferred on another.").

The Fourth Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminatory intent: "(1) evidence of a 'consistent pattern' of actions by the decision-making body disparately impacting members of a particular class of persons; (2) [the] historical background of the decision, which may take into account any history of discrimination by the decision-making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decision-makers on the record or in minutes of their meetings." <u>Reaching Hearts</u>, 584 F.Supp.2d at 781 (quoting <u>Sylvia</u>, 48 F.3d at 819).

Importantly, "a government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves." <u>Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty.</u>, 915 F.3d 256, 260–61 (4th Cir. 2019) (citing <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 448 (1985)). Further, "[s]uch impermissible influence may be inferred where expressions of community bias are followed by irregularities in government decision-making." <u>Id.</u> (citing <u>Smith v. Town of Clarkton</u>, 682 F.2d 1055, 1066 (4th Cir. 1982)).

Here, Plaintiffs contend that the sequence of events leading up to the County's decision, departures from the County's normal procedures, and contemporary statements by County decision-makers demonstrate that County Defendants' actions were motived by the community's anti-Muslim beliefs. First, Plaintiffs note that community members began complaining to County officials about the Property as early as October 2016, and community opposition continued to grow through August and September 2017—all while the County repeatedly rejected Plaintiffs' attempts to obtain certain permits for the Property. Second, Plaintiffs argue that the County significantly departed from its usual practices by issuing the demands in Lambert's September 5, 2017 letter, insisting that the original bonds were invalid, and later refusing to call the bonds to complete the infrastructure work on the Property. Finally, Plaintiffs point to Delegate McDonough's directive to Glassman about refusing to issue any permits with respect to the Property and to Boniface's statement about "cross[ing] our t's and dot[ting] our i's" because of the scrutiny related to the "mosque issue" as evidence that County officials were motivated by community pressure.

Conversely, County Defendants maintain that their decisions here were motivated by their desire to conform to existing practices and the County Code. First, County Defendants argue that it has been the County's long-standing practice to require new bonds when a property changes hands, pointing to the 2008 email from Hartka stating that the County would require new bonds from any developer that took over the Property. County Defendants also argue that the County has the discretion to call bonds, and that calling the

bonds under the circumstances present here would be a major departure from the County's normal procedure, not the other way around. Finally, County Defendants maintain that they are within their authority under the County Code to require Plaintiffs to comply with the most recent SWM requirements and submit new PWAs and PWUAs in order to obtain building permits and occupancy certificates.

With these arguments in mind, and viewing the facts in a light most favorable to County Defendants, the Court concludes that there is a genuine dispute of material fact as to the intent of the County Defendants. This does not change when the Court views the facts in a light most favorable to Plaintiffs. Accordingly, the Court will deny Plaintiffs' and County Defendants' Motions as to Counts I–III, IV, and VI.

###    3.    Substantive Due Process (Count V)

To make out a claim that County Defendants' action violated substantive due process, Plaintiffs must demonstrate: "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Sylvia Dev. Corp., 48 F.3d at 827 (citing Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them.") (internal quotations omitted)). The protection of substantive due process covers only state action that is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally

incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Id. (quoting Rucker v. Harford Cty., 946 F.2d 278, 281 (4th Cir. 1991)). In the context of a zoning action involving property, it must be clear that the state's action "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." Id. (quoting Nectow v. Cambridge, 277 U.S. 183, 187–88 (1928) (internal quotations omitted)).

Here, as discussed above, County Defendants have put forward evidence that their decision to deny permits to Plaintiffs was based on the County's long-standing interpretation of the zoning code. Whether the facts are viewed in the light most favorable to Plaintiffs or County Defendants, there is a genuine dispute of material fact as to whether County Defendant's actions "ha[d] no foundation in reason" and were "a mere arbitrary or irrational exercise of power." See Sylvia, 48 F.3d at 827. Accordingly, the Court will deny Plaintiffs' and County Defendants' Motions as to Count V.

### 4.    RLUIPA Substantial Burden (Count VII)

RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a). To state a RLUIPA

substantial burden claim, a plaintiff "must show that a government's imposition of a regulation regarding land use, or application of such a regulation, caused a hardship that substantially affected the plaintiff's right of religious exercise." Hunt Valley, 2017 WL 4801542, at *25 (quoting Andon, LLC v. City of Newport News, 813 F.3d 510, 514 (4th Cir. 2016)).

"[L]and use regulations can substantially burden religious exercise where an organization acquires property expecting to use it for a religious purpose but is prevented from doing so by the application of a zoning ordinance." Jesus Christ Is the Answer Ministries, Inc., 915 F.3d at 260–61. To determine if the government has violated RLUIPA, the Court asks: (1) whether the impediment to the organization's religious practice is substantial; and (2) whether the government or the religious organization is responsible for the impediment. Id. at 261. A burden is typically substantial "where use of the property would serve an unmet religious need, the restriction on religious use is absolute rather than conditional, and the organization must acquire a different property as a result." Id. (citing Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 557–58 (4th Cir. 2013)). As to the second question, a court looks to "whether the organization had a 'reasonable expectation' of religious land use and whether the burden faced by the organization is 'self-imposed.'" Id. (first quoting Bethel, 706 F.3d at 558; and then quoting Andon, 813 F.3d at 515). By way of example, "[w]hen a religious organization buys property reasonably expecting to build a church, governmental action impeding the

building of that church may impose a substantial burden." <u>Hunt Valley</u>, 2017 WL 4801542, at *25 (quoting <u>Bethel</u>, 706 F.3d at 557).

Here, Plaintiffs argue that County Defendants imposed a substantial burden by departing from the County's typical procedures when approving OT's plan for the community center. First, although OT had assured the County through its July 31, 2017 letter that the community center would not be open to the public, Boniface stated at the September 11, 2017 public meeting that the plans for the community center were on hold. Second, Plaintiffs point out that County Defendants took nearly three months to approve OT's plan for the community center—which is nearly twice as long as the County's typical timeline for approval—and the County did not issue final approval until after Plaintiffs filed suit on September 21, 2017. Third, Plaintiffs note that, although the County Code requires Lambert, Boniface, and Glassman to sign off on the plan for the community center, only Boniface ultimately signed the final plat. Plaintiffs contend that, taken together, these facts suggest that County Defendants' imposed a substantial burden on Plaintiffs' right of religious exercise in violation of RLUIPA. By contrast, County Defendants contend that the County's approval process was actually faster than Plaintiffs anticipated and, in any event, County Defendants ultimately took Plaintiffs' side in the dispute by granting final approval of the community center.

At bottom, a genuine dispute of material fact exists as to whether County Defendants' actions delaying approval of the community center imposed a substantial burden on S&S and Khan's right of religious exercise. On the one hand, Lambert's July

25, 2017 letter declaring that the community center could not be used as a mosque could be interpreted to substantially affect the right of religious exercise. Additionally, the months between preliminary approval and the final approval of the community center could also weigh in favor of a finding of substantial burden. On the other hand, it is not clear whether the community center would serve an unmet religious need or whether the County's limitations on the community center were absolute or conditional. Further, because the County ultimately approved the community center, to the Court's knowledge the Plaintiffs were not forced to purchase another property in order to exercise their religious freedoms. Even viewing the facts in a light most favorable to the County Defendants, the Court cannot resolve the question of substantial burden on summary judgment. This does not change when the Court views the facts in a light most favorable to Plaintiffs. Accordingly, the Court will deny Plaintiffs' and County Defendants' Motions as to Count VII.

The Court next turns to County Defendants' Motion as to Counts VIII–XVII. Aside from Count XVI, Plaintiffs' claim for judicial review of administrative acts, County Defendants' Motion does not make arguments specific to each of the counts. Nonetheless, the Court briefly addresses each claim in turn.

### 5.    Maryland Declaration of Rights (Count VIII and Count IX)

It is well-established that Articles 24 and 26 of the Maryland Declaration of Rights are the state constitutional analogs to the First, Fourth, and Fourteenth Amendments of the U.S. Constitution and are interpreted in pari materia with their federal counterparts. See

Booth v. Maryland, 337 F.App'x. 301, 311 (4th Cir. 2009) (noting that Maryland appellate courts have assumed that Article 26 and the First Amendment of the United States Constitution have the same effect); see also Doe v. Dep't. of Pub. Safety & Corr. Servs., 971 A.2d 975, 982 (Md.Ct.Spec.App. 2009); Padilla v. State, 949 A.2d 68, 78 (Md.Ct.Spec.App. 2008).

Consistent with the Court's analysis above, Counts VII and IX cannot be resolved on summary judgment because a genuine dispute of material fact exists as to whether County Defendants possessed discriminatory intent. Accordingly, the Court will deny County Defendants' Motion as to Counts VIII and IX.

### 6. Fair Housing Act (Counts X and XI)

The FHA prohibits property owners from "mak[ing] unavailable or deny[ing] a dwelling to any person because of race, color, religion, sex, familial status, or national origin" and prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a)–(b) (2018). Likewise, § 3617 of the FHA prohibits discriminatory interference with private efforts to construct integrated housing. Smith v. Town of Clarkton, 682 F.2d at 1068; Nat'l Fair Hous. All. v. Bank of Am., N.A., No. CV CCB-18-1919, 2019 WL 3241126, at *15 (D.Md. July 18, 2019). Importantly, to prevail on an FHA disparate-treatment discrimination claim, a "plaintiff must establish that the defendant had a discriminatory intent or motive." Clark v. 100 Harborview Drive Council

of Unit Owners, No. JFM-14-3122, 2016 WL 1159198, at *4 (D.Md. Mar. 23, 2016) (quoting Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2513 (2015)) (internal quotation marks omitted).

As described above, a genuine dispute of material fact exists as to whether County Defendants' actions were motivated by discriminatory intent. Because the Court cannot yet render judgment as a matter of law on Counts X and XI, the Court will deny County Defendants' Motion as to those counts.

### 7. Racial Discrimination under § 1981 (Count XII) and Deprivation of Property under § 1982 (Count XIII)

Section 1981 provides that all persons within the United States shall have the "full and equal benefit of all laws" as is "enjoyed by white citizens." 42 U.S.C. § 1981 (2018). As interpreted, § 1981 applies only to claims of discrimination based on race or national origin, and specifically does not cover religious discrimination. Abdelkader v. Sears, Roebuck & Co., No. CIV. L-10-511, 2010 WL 2595571, at *3 (D.Md. June 24, 2010) (citing Saint Francis Coll. v. Al–Khazraji, 481 U.S. 604, 613 (1987) (stating that a claim of discrimination based solely on one's religion does not constitute a claim under § 1981) (emphasis added); Proa v. NRT Atl., 618 F.Supp.2d 447, 461 (D.Md. 2009) (finding that "§ 1981 is limited to race-based disparate treatment and/or hostile work environment claims"). Like § 1981, § 1982 also does not protect against religious discrimination. Scambos v. Comput. Mgmt. Servs., Inc., No. CIV. A. PJM-97-3288, 1998 WL 476256, at *2 (D.Md. Jan. 28, 1998), aff'd, 155 F.3d 561 (4th Cir. 1998).

Here, Plaintiffs have alleged that County Defendants' actions were motivated by racial discrimination in addition to religious animus. (Am. Compl. ¶¶ 85, 137, 179, 184–195, ECF No. 40). Specifically, Plaintiffs state that County Defendants were influenced by the "Arabic appearance" of the potential Old Trails homeowners, and not merely by their religious affiliation. (Id. ¶ 85; see also Photos of Groundbreaking Ceremony). At this point in the litigation, and absent any opposing arguments by County Defendants, the Court cannot rule as a matter of law that County Defendants' actions were not motivated in part by racial discrimination. As such, the Court will deny County Defendants' Motion as to Counts XII and XIII.

### 8. Conspiracy to Interfere with Civil Rights under § 1985 (Count XIV) and Neglect to Prevent Conspiracy under § 1986 (Count XV)

The Supreme Court has held that a plaintiff must prove four elements to make out a violation of § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Trerice v. Summons, 755 F.2d 1081, 1085 (1985 (quoting Griffin v. Breckenridge, 403 U.S. 88, 91 (1971)). The conspiracy must be motivated by "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." Griffin, 403 U.S. at 102. In construing this requirement, the Supreme Court and the Fourth Circuit have held that religious groups are a protected class. See, e.g., Ward v. Connor, 657 F.2d 45 (4th Cir. 1981). Section 1986

establishes liability for persons who have knowledge of a conspiracy to interfere with civil rights in violation of § 1985 and the power to prevent or aid in preventing those acts, but who neglects or refuses to do so. 42 U.S.C. § 1986 (2018).

Here, as discussed above, a genuine dispute of material fact exists as to whether County Defendants' actions were motivated by discriminatory intent. Because the Court cannot yet render judgment as a matter of law on Counts XIV and XV, the Court will deny County Defendants' Motion as to those counts.

### 9.    Judicial Review of Administrative Acts (Count XVI)

County Defendants urge this Court to abstain from deciding Count XVI under the doctrine adopted by the Supreme Court in Burford v. Sun Oil Co., 319 U.S. 315 (1943), arguing that the Court's review of County Defendants' administrative decision would involve questions about the interpretation and application of County Code. Plaintiffs respond that this case is unlike other Burford abstention cases because it is fundamentally a religious discrimination case, not a zoning case, and therefore the Court does not risk interfering with local policy. The Court agrees with County Defendants.

Pursuant to Burford, a federal court may, in its discretion, abstain from consideration of cases over which it has jurisdiction to show "'proper regard for the rightful independence of state [or county] governments in carrying out their domestic policy.'" Hunt Valley, 2017 WL 4801542 at *18–20 (quoting Burford, 319 U.S. at 318). In cases involving "federal claims [that] stem solely from construction of state or local land use or zoning law . . . the district courts should abstain under the Burford doctrine to avoid

interference with the . . . locality's land use policy." Id. (quoting Pomponio v. Fauquier Cty. Bd. Of Sup'rs, 21 F.3d 1319, 1328 (4th Cir. 1994)). Consistent with this principle, this Court has previously permitted a plaintiff's constitutional claims to move forward while exercising its discretion to refrain from reviewing a county's administrative decisions under the Burford doctrine. See Hunt Valley, 2017 WL 4801542 at *20 (declining to abstain as to plaintiff's constitutional and RLUIPA claims, but abstaining from considering plaintiff's claim for judicial review of a county's administrative decision).

Thus, while the Court need not abstain from considering Plaintiffs' constitutional and statutory claims, the Court is well within its authority under the Burford doctrine to dismiss Plaintiffs' claim for judicial review of County Defendants' administrative acts. As such, the Court will grant County Defendants' motion as to Count XVI.

### 10. Tortious Interference with Contractual and Prospective Business relations (Count XVII)

A claim for tortious interference with business relationships arises where a third-party induces the breach of an existing contract between two other parties or, more broadly, maliciously or wrongfully interferes with economic relationships. K & K Mgmt., Inc. v. Lee, 557 A.2d 965, 973–74 (Md. 1989). The elements of tortious interference with business relationships are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting. Nat. Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (Md. 1984).

At this stage in the litigation, considering the facts in the light most favorable to Plaintiffs, County Defendants have not shown there is no genuine dispute of material fact as to the effect of County Defendants' actions on the contractual or economic relationship between OT, Gemcraft, and S&S. Accordingly, the Court will deny County Defendants' Motion as to Count XVII.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Partial Summary Judgment (ECF No. 196). The Court will grant in part and deny in part County Defendants' Motion for Summary Judgment (ECF No. 200). The Court will deny County Defendants' Motion as to Counts I–XV and XVII and grant County Defendants' Motion as to Count XVI. A separate Order follows.

Entered this 23rd day of September, 2019.

_____/s/_____
George L. Russell, III
United States District Judge