# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

OT, LLC, et al.,                    *
                                    *
       **Plaintiffs,**          *
                                    *
**v.**                              *          **Civil Case No. SAG-17-02812**
                                    *
HARFORD COUNTY, et al.,             *
                                    *
       **Defendants.**          *
                                    *
                \*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

    .   THIS MATTER is before the Court on the Motion for Summary Judgment filed by Defendants Patrick McDonough and Richard Impallaria (the "Delegates"), ECF 199. Gemcraft Homes, OT, LLC, Inc., Shades and Springs, Inc., and Ajaz Khan (collectively "Plaintiffs") have sued Harford County, certain County officials, and the Delegates under numerous causes of action. Essentially, Plaintiffs allege that the Delegates conspired with Harford County officials to thwart a real estate development project because most of the prospective homebuyers are Muslim. *See* ECF 204 at 2. I have considered the Delegates' motion, ECF 199, Plaintiffs' opposition, ECF 204, and the Delegates' reply, ECF 210. The Motion is ripe for disposition, and no hearing is necessary. *See* Local R. 105.6 (D. Md. 2018). For the reasons explained below, the Delegates' motion is **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL BACKGROUND[1]

    The facts below are taken in the light most favorable to Plaintiffs, who are the non-moving party.

---

[1] A more comprehensive factual background is available in *OT, LLC v. Harford Cty., Md.*, Civil Action GLR-17-2812, 2019 WL 4598009, at \*1–6 (D. Md. Sep. 23, 2019).

<u>Development of Old Trails</u>

This case centers around the Old Trails Subdivision ("Old Trails" or "Property") in Harford County, Maryland. In 2004, Old Trails Partnership ("OTP") acquired title to the property that became Old Trails. ECF 146 at 2. OTP partnered with Tousa Homes, Inc., to develop Old Trails into a residential townhome community. *Id.* In furtherance of this goal, OTP entered into numerous agreements with Harford County ("County"). For instance, in 2005, the parties entered into a Storm Water Management Maintenance Agreement, and a separate Subdivision Agreement. Stipulation of Facts, ECF 133-1 at 1. Between 2007 and 2008, Tousa built four townhomes in Old Trails, and sold them to homebuyers. ECF 40 at 16. However, Tousa declared bankruptcy in 2008, and both Tousa and OTP halted development of the Old Trails project. *Id.*

Gemcraft is a Maryland corporation and a regional home builder. *Id.* at 7. Gemcraft's president, William Luther, entered into an August 17, 2016 agreement with OTP to purchase Old Trails. *See* Purchase and Sale Agreement, ECF 168-1. Gemcraft and OT, LLC ("OT") are related entities. ECF 40 at 7. On April 5, 2017, OT entered into an Option Agreement with Shades and Springs ("S&S"), a non-profit corporation that was formed under the authority of the governing body of the Ahmadiyya Muslim Community in the United States. ECF 40 at 17–18 (explaining that the Ahmadiyya Muslim Community "is the leading Islamic organization to categorically reject terrorism (jihad) in any form," and "face[s] extraordinary persecution in the Middle East and South Asia"). Under the agreement, S&S had an option to purchase as many as forty-five lots at Old Trails. *Id.* Additionally, the option agreement required OT to seek approval for the construction of a community center on the property, to be used for prayer and other activities. *Id.* at 20.

<u>Opposition to the Project</u>

In the spring of 2017, as word spread that Muslim families were planning to move into the Old Trails subdivision, some community members expressed concerns. For instance, two local realtors, Gina and Jorge Pimentel, started a social media campaign in efforts to inhibit the project. *See, e.g.*, Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment, ECF 204-3, Exhibit 2 (writing on Facebook "STOP OFFENSIVE BUILDING ON HISTORIC SHORES OF TRAILS WAY"). In addition to the Pimentels, other individuals derided the project on social media, and initiated an online petition called "Joppa Lives Matter." ECF 204 at 3; *see also* Social Media Binder, Hrg. on June 5, 2018.[2]

In 2017, Patrick McDonough and Richard Impallaria served as elected members of the Maryland House of Delegates. Both Delegates were in the midst of political campaigns: McDonough for Baltimore County Executive, and Impallaria for re-election to the House of Delegates.[3] ECF 204 at 3. Relevant here, the Delegates aligned themselves with community opposition to the Old Trails project. For example, Impallaria included his opposition on a campaign flier. *Id.* at 4.

In the spring or summer of 2017, McDonough engaged County Executive Barry Glassman in a conversation about the Old Trails project. ECF 199-1 at 7. McDonough summarized this conversation at a meeting with constituents. ECF 19-23 at 48:56. Per his own words, he directed Glassman to "get [his] County Attorney to investigate this," to "find out in total detail," and to "not issue any permits." ECF 204 at 4. In response, Glassman nodded his head and said, "we're

---

[2] Plaintiffs compiled a binder filled with what they deem to be offensive posts from various social media platforms. It was entered into evidence as Exhibit E at the hearing in June, 2018.

[3] Delegate McDonough lost the primary election for County Executive. Delegate Impallaria currently represents District 7.

working on it." *Id.* Although the Delegates contend that the conversation was "fleeting in nature," Delegates' Memorandum in Support of Motion for Summary Judgment, ECF 199-1 at 8, Glassman testified that it was "threaten[ing]," *see* ECF 204 at 4.[4] At the time of this conversation, McDonough maintained considerable influence in the County. *Id.* at 5. He had not only served as an elected official for several decades, but also maintained his own weekly radio show and monthly television show. *Id.*

Community Hearings

Impallaria worked with Gina Pimentel to organize a town hall on September 7, 2017, for community members to voice their complaints about the Old Trails development. *Id.* at 6. Impallaria communicated with County officials, and pressured them to attend the meeting. *Id.* At the meeting, McDonough expressed anti-Islamic sentiments, including suggesting the project could be related to "Sharia Law." *Id.* at 7. He also stated that Glassman would be in "collusion" with the project if his administration did not investigate and prevent its completion. *Id.*

One day after this meeting, the Delegates sent a joint letter stating, "[w]e are requesting that no more permits be issued and that no further occupancy permits be granted until a full investigation has been completed." ECF 204-16, Exhibit 15. The letter also demanded that "the community be represented either by the Harford County Attorney or the People's Counsel as this moves forward." *Id.* Plaintiffs and the Delegates disagree on how significant this letter was in influencing the County's behavior. *See* ECF 199-1 (contending "there is no evidence that the County took either letter as a directive as to how to handle the project"). However, it is not disputed

---

[4] From the hearing transcript, it is not entirely clear whether Glassman was describing this particular conversation or a different one as "threatening." *See* Hearing Transcript, ECF 130 at 29. For the purposes of this motion, I have drawn a reasonable inference in Plaintiffs' favor.

that Glassman forwarded the letter to his County Attorney. ECF 204-19, Exhibit 18. Furthermore, Glassman responded to Impallaria, via email, a few days later. ECF 204-21, Exhibit 20.

Billy Boniface is the Harford County Director of Administration. ECF 40 at 3. Three days after the County received the Delegates' letter, Boniface represented the County at a Joppatowne Community Advisory Board meeting. ECF 204 at 8. Boniface told the crowd that the County would stop the Old Trails Project, thereby adhering to the Delegates' request. *See id.* For example, he declared that, "[t]hey can build the houses but they can't put anybody in them." ECF 204-22, Exhibit 21.

The Delegates presided over three more town hall meetings in the Fall of 2017 — one each in September, November, and December. ECF 204 at 8. Additionally, in December, 2017, Impallaria filed a mandamus action in Harford County Circuit Court seeking to prohibit the County from allowing construction of the community center at Old Trails. ECF 204-24, Exhibit 23.

Procedural History

OT and Gemcraft filed suit against the County and County officials ("County Defendants"), as well as the Delegates, on September 21, 2017. ECF 1. OT and Gemcraft — along with S&S and Khan — filed an amended complaint on December 1, 2017. ECF 40. The complaint contains seventeen counts: § 1983 claims for violations of the Free Exercise Clause (Count I), Establishment Clause (Count II), and Freedom of Association Clause (Count III) of the First Amendment to the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (Count IV), and deprivation of Substantive Due Process under the Fifth and Fourteenth Amendments to the U.S. Constitution (Count V); violation of the nondiscrimination and substantial burden provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (Counts VI and VII); violation of

Articles 24 and 36 of the Maryland Declaration of Rights (Counts VIII and IX); violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, 42 U.S.C. § 3617 (Counts X and XI); racial discrimination under 42 U.S.C. § 1981 (Count XII); deprivation of rights under 42 U.S.C. § 1982 (Count XIII); conspiracy to interfere with civil rights under 42 U.S.C. § 1985 (Count XIV); neglect to prevent conspiracy under 42 U.S.C. § 1986 (Count XV); judicial review of the County administration's actions (Count XVI); and tortious interference with contract and prospective business relations (Count XVII). *Id.*

In addition to their amended complaint, Plaintiffs filed a motion seeking preliminary injunctive relief. ECF 19. The County had refused to issue water and sewer hookup permits, use and occupancy permits, and building permits that were necessary for completion of Old Trails. *Id.* United States District Judge George L. Russell III held a hearing on Plaintiffs' motion on June 4– 7, and June 11, 2018. Several witnesses testified, including Glassman, Boniface, Impallaria, McDonough, Luther, and Faheem Younus (the President of S&S). *See* ECF 129, ECF 128, ECF 130. On June 22, 2018, Judge Russell issued an Order, granting in part and denying in part the preliminary injunctive relief sought by Plaintiffs. ECF 133. Specifically, the Court ordered the County Defendants to issue use and occupancy permits, and sewer and water hook-up permits.[5]

On August 21, 2018, Judge Russell denied the Delegates' motion to dismiss the amended complaint. ECF 145.[6] Finally, on September 23, 2019, Judge Russell denied cross-motions for Summary Judgment by Plaintiffs and the County Defendants, except that he granted Summary

---

[5] More precisely, Judge Russell ordered issuance of use and occupancy permits and/or certificates and sewer and water hook up permits for certain town houses, and upon completion of certain administrative steps. The specific details are available at ECF 133.

[6] Judge Russell's Order is technically a partial grant and partial denial. He granted the motion to the extent that Plaintiffs sought damages under RLUIPA against the Delegates, since damages against state officials are prohibited under the statute. ECF 145 at 4 n.2. The motion was otherwise denied.

Judgment for the County Defendants on Count XVI (judicial review of administrative acts).  *See*

Memorandum Opinion, ECF 217.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Defendants, as the

moving party, bear the burden of showing that there is no genuine dispute of material facts.  *See*

*Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo*

*Props.*, 810 F.2d 1282,1286 (4th Cir. 1987)).  If Defendants establish that there is no evidence to

support Plaintiffs' case, the burden then shifts to Plaintiffs to proffer specific facts to show a

genuine issue exists for trial.  *Id.*  Plaintiffs must provide enough admissible evidence to "carry the

burden of proof in [their] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d

1310, 1315–16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of

Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

find for Plaintiffs.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one

inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d

669, 671 (D. Md. 1999)).  Additionally, summary judgment shall be warranted if the non-moving

party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.

Plaintiffs "must produce competent evidence on each element of [their] claim." *Id.* at 348–49

(quoting *Miskin*, 107 F. Supp. 2d at 671).  If Plaintiffs fail to do so, "there can be no genuine issue

as to any material fact," because the failure to prove an essential element of the case "necessarily

renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010 (unpublished)).

In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.    ANALYSIS

### A.  Qualified Immunity

The Delegates argue primarily that summary judgment is appropriate because they are shielded by the doctrine of qualified immunity.  Since qualified immunity would immunize the Delegates from most of Plaintiffs' federal claims, I start the analysis here.  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which reasonable persons would have known*." Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Courts are directed to conduct two initial inquiries: (1) determine if the defendant's conduct, taken in the light most favorable to the party asserting the injury, violated a federal right, and (2) assess whether the right was "clearly established" at the time the violation occurred.  *See Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015); *see also Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019) (stating courts "need not address those inquiries in sequence, but instead may exercise [their] 'sound discretion' in deciding which issues to first address").  In this case, viewing the evidence in the light most favorable to Plaintiffs, the Delegates — in conjunction with the County officials — violated multiple federal rights.  Plaintiffs have adduced evidence that the Delegates conspired with the County to impede a housing project because of the religious identity

of prospective occupants, in violation of, *inter alia*, the Free Exercise Clause of the First Amendment, the Fair Housing Act, and RLUIPA.

However, in determining whether an allegedly violated right was clearly established, "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). In *Pritchett*, an individual brought claims under Section 1983, alleging that police officers violated his Fourth and Fourteenth Amendment rights by arresting him without probable cause. *Id.* at 309. Analyzed at the appropriate level of particularity, the court defined the relevant right as "the right not to be arrested except upon probable cause to believe that [he] had violated [the relevant South Carolina Highway regulation]." *See id.* at 313–14. In its analysis, the panel did not find it dispositive that previous courts had not applied Fourth Amendment rights to the specific factual scenario of that case:

> The fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless "clearly established" for qualified immunity purposes … "Clearly established" in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.

*Id.* at 314. Accordingly, the court concluded that the right at issue in *Pritchett* was clearly established, and found that the district court properly declined to grant summary judgment. *Id.* at 314–15.

Plaintiffs describe the rights at issue in very general terms. *See* ECF 204 at 10 (describing "freedom of assembly," "freedom to practice one's religion," the right to "receive the equal protection of the laws" and to "be free from discrimination based on race or religion").[7] However,

---

[7] The Delegates do not appear to challenge the threshold legal question of whether the rights at issue were clearly established. Rather, they contend "it is not well-established that [their] actions *could form the basis of a conspiracy*." ECF 199-1 at 18 (emphasis added). In other words, they contest whether the right is one "of which reasonable persons would have known" in these particular factual circumstances, not whether the right was clearly established in the first

"the dispositive question is whether the violative nature of *particular* conduct is clearly established," *Brown v. Elliott*, 876 F.3d 637, 642 (4th Cir. 2017). Even so, in determining whether alleged conduct violated clearly established rights, courts should not limit the inquiry to the precise factual circumstances of the case at hand. *See Elliott*, 876 F.3d at 642 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

With these principles in mind, I find that multiple rights at issue were "clearly established" such that a reasonable person would have known that the Delegates' conduct could be violative. *See Booker v. South Carolina Dep't of Corrections*, 855 F.3d 533, 538 (4th Cir. 2017) (explaining that courts should examine cases of controlling authority in this jurisdiction). For example, Plaintiffs assert that the Delegates have infringed on their right to receive equal protection of the laws when pursuing housing options, and infringed on their right to be free from discrimination when requesting permits from the government. This jurisdiction has recognized, on numerous occasions, that the government's discriminatory conduct can violate federal law, and deprive individuals of their foremost constitutional rights. For example, the government should not enact regulations that unnecessarily burden religious exercise. *See, e.g.*, *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 555–59 (4th Cir. 2013) (reversing district court's grant of summary judgment on a claim that the county's zoning regulations substantially burdened the religious exercise of a church, in violation of RLUIPA). Moreover, local governments should not block housing projects because of discriminatory motive. *See, e.g.*, *Smith*

---

instance. This contention is a rehash of the Delegates' arguments, in their Motion to Dismiss, about the underlying statutes at issue. *See, e.g.*, ECF 57-1 at 31 ("To state a claim under § 1981 or § 1982, a plaintiff must show an '*intent* to discriminate on the basis of race,' and no such intent can be attributed to either Delegate Impallaria or Delegate McDonough."). As Judge Russell explained in *OT v. Harford County*, ECF 217 at 25, the question of intent is replete with factual questions that should be decided by a factfinder.

*v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064–67 (4th Cir. 1982) (upholding trial court's findings that town violated the Fourteenth Amendment and the FHA by blocking construction of public housing because of racial animus).  Although Plaintiffs have not identified controlling case law in which courts have encountered the precise circumstances of this case, the rights at issue are, nevertheless, clearly established.  *See Ray*, 781 F.3d at 100 ("We do not require a case directly on point in order to conclude that the law was clearly established so long as existing precedent [has] placed the statutory or constitutional question beyond debate.") (internal citation omitted).

The Delegates principally rely on *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983).  In *Scott*, a real estate developer attempted to develop a parcel of land into a housing complex for low-income families.  *Id.* at 1412.  However, the county council stopped issuing any building permits, while Scott's application was the only one pending.  *See id.* at 1412–13.  Scott sued under § 1983, alleging that the county council had conspired with private landowners opposing the development to violate his Fifth and Fourteenth Amendment rights.  *Id.* at 1413.  With respect to Scott's conspiracy claims, the court found that summary judgment was appropriate for the private landowner defendants because,

> even overtly biased citizens who write letters, speak up at public meetings, or even express their prejudices in private meetings with public officials without formulating a joint plan of action are not "conspiring" with those officials in a way that subjects them to § 1983 liability.

*Id.* at 1424.  Here, the Delegates' conduct is not comparable to that of private citizens who merely express their views on an issue.  Plaintiffs have provided evidence that, unlike the constituents in *Scott*, the Delegates *prompted* the County to stop issuing permits for Old Trails, because of the religious identity of the eventual occupants.

The pertinent question, with respect to qualified immunity, is whether reasonable persons would have known that the Delegates' conduct could violate these clearly established rights.

Importantly, "if there are genuine issues of historical fact respecting the [defendant's] conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial." *Pritchett*, 973 F.2d at 313. Here, there are genuine questions of material fact about the Delegates' conduct as it pertains to Old Trails. For instance, the parties disagree about the nature of the conversation between Glassman and McDonough in the summer or fall of 2017. While the Delegates minimize the significance of this conversation, Plaintiffs provided evidence that the County acted at McDonough's behest. In fact, when McDonough directed Glassman to have the County investigate, Glassman stated, "we're working on it" in direct response. ECF 204-4 at 21. Furthermore, in his testimony to this Court, Glassman stated that McDonough "called and threatened" him regarding the project. *See* ECF 130 at 29. Plaintiffs suggest that the County's subsequent conduct — including its decision to withhold permits — was partially a result of this conversation. As a second example, Dr. Younus testified about an interaction with Impallaria at a town hall, in which Impallaria personally bullied him, and made a reference to the September 11, 2001 terrorist attacks. ECF 204 at 16. As an inherent part of reaching its verdict, a jury will find facts to assess, *inter alia*, (1) the nature of these conversations, (2) whether the County's subsequent denials for permits were driven by discriminatory motive, and (3) whether there is a requisite connection between the Delegates' conduct and the County's actions. However, drawing all reasonable inferences in Plaintiffs' favor, I conclude that there are genuine factual questions about the Delegates' actions. Therefore, summary judgment is not appropriate. *See Hupp v. Cook*, 931 F.3d 307, 326 (4th Cir. 2019) (concluding that factual

questions must be submitted to a jury, and the legal question of whether the officer is entitled to qualified immunity is reserved for the court).[8]

## B. Substantive Claims: Sections 1985 and 1986 (Counts XIV – XV)

Plaintiffs alleged that the Delegates conspired with County officials, and other Defendants, to deprive them of their civil rights in violation of federal law. *See* ECF 40 at 92–99. Specifically, federal law makes it illegal for two or more persons to conspire to interfere with the civil rights of another person, *see* 42 U.S.C. § 1985, and for any person to neglect to prevent the commission of these unlawful acts, *see* 42 U.S.C. § 1986. The Delegates contend that this Court should grant summary judgment, because there is no evidence that their conduct could form the basis of a conspiracy. ECF 199-1 at 15.

Four elements are required to establish a violation of § 1985: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and 3) an act in furtherance of conspiracy (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See* 42 U.S.C. § 1985(3); *see also Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985) (quoting *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 827 (1983)). Furthermore, to maintain allegations of a conspiracy, plaintiffs must demonstrate more than "parallel conduct and a bare assertion of conspiracy." *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (listing elements of a § 1985 conspiracy).

---

[8] The Delegates are not prohibited from raising qualified immunity as a defense at trial. For instance, after the jury renders its decision, the Delegates are free to move for a judgment notwithstanding the verdict on the basis of qualified immunity. *See, e.g.*, *Wolfe v. Routzahn*, 953 F.Supp. 2d 627, 633 (D. Md. 2013).

In *Thomas v. The Salvation Army*, 841 F.3d 632 (4th Cir. 2016), the court dismissed the plaintiff's claims of a civil conspiracy. After the plaintiff, Sharon Thomas, was evicted from a homeless shelter ("Church in the City"), the Salvation Army prohibited her from staying at its location as well. *Id.* at 635–36. As such, Thomas claimed that Church in the City and the Salvation Army conspired to deprive her of federal rights, because of her mental disability. However, the court found that Thomas failed to adduce facts showing any coordination or conspiracy. *Id.* at 638. The fact that the Salvation Army would not let Thomas return, based upon her eviction from the other shelter, "simply show[ed] two charities working to help the same population of homeless people." *Id.* at 638. Here, Plaintiffs have done much more than provide "conclusory allegations" of "parallel conduct." *See id.* at 637. It is undisputed that McDonough had a private conversation with Glassman regarding the Old Trails Project, and Glassman described the conversation as "threaten[ing]." It is further undisputed that the Delegates, after a raucous townhall meeting organized by Impallaria, sent a joint letter specifically requesting that the County stop issuing permits. Since County officials, shortly thereafter, expressed their intent to stop the project, and since the County ultimately did refuse to issue certain permits, there are, at bottom, genuine questions of material fact about whether the evidence is sufficient to establish a conspiracy between the Delegates and the County.

## C. Section 1983 Claims (Count I – V)

Plaintiffs have pressed forward with several claims under § 1983. Section 1983 gives injured plaintiffs a cause of action when they have been deprived of federal rights under color of state law. *Riddick v. School Bd. of City of Portsmouth*, 238 F.3d 518, 521 n.2 (4th Cir. 2000). Here, Plaintiffs allege that they have been deprived of their rights under the First, Fifth, and Fourteenth Amendments. For similar reasons to those addressed above, the Delegates' summary

judgment arguments are unpersuasive.[9]  According to the Delegates, conduct that is devoid of threats, intimidation, or coercion is not actionable under § 1983, and is protected by the First Amendment.  ECF 199-1 at 23.  Even accepting that premise, genuine questions of material fact exist about whether the Delegates threatened, intimidated, and coerced others during the course of their conduct.  For example, the Delegates do not dispute that they organized townhalls in which citizens openly disparaged the Open Trails project.  A witness testified, at a hearing in this Court, that the meetings had a "lynch mob" atmosphere.  ECF 204 at 16.  Moreover, Dr. Younus, the President of S&S, testified that Impallaria personally threatened him, including by making an allusion to the September 11, 2011 terrorist attacks.  *See id*.  And Glassman testified that McDonough was threatening in their relevant conversation.  A reasonable jury could determine that these incidents are examples of threatening and intimidating conduct leveraged by the Delegates to impede the Old Trails project, and therefore, summary judgment is unwarranted.

## D.  RLUIPA Claims (Counts VI – VII)

Plaintiffs have claimed two violations of RLUIPA.  The nondiscrimination provision of RLUIPA provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2); *see also Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 559 (4th Cir. 2013).  RLUIPA's "substantial burden" provision, on the other hand, makes it illegal for the government to substantially burden the religious exercise of a person, assembly, or institution, unless the government can satisfy strict

---

[9] However, to the extent that Plaintiffs have sued the Delegates in their official capacities as state officers, summary judgment is granted to the Delegates on counts I-V.  States are not "persons" within the meaning of § 1983, and state officials cannot be sued in their official capacity for monetary relief. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *see also Williams-El v. Dunning*, 816 F.Supp. 418, 420 (E.D. Va. 1993) (stating officers sued in their official capacities for monetary relief are not "persons" under § 1983).  Furthermore, Plaintiffs have not identified any injunctive relief that they seek from the Delegates.

scrutiny.  *See* 42 U.S.C. § 2000cc(a); *see also Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 514 (4th Cir. 2016).

The Delegates do not argue that there are no genuine issues of material fact with respect to the legal framework of RLUIPA.  Rather, their contentions are limited to qualified immunity, which was addressed above, and deemed inappropriate as a basis for summary judgment.[10]

### E.  Fair Housing Act Claims (Counts X – XI), Section 1981 (Count XII), and Section 1982 (Count XIII)

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every state … to make and enforce contracts … as is enjoyed by white citizens."  42 U.S.C. § 1981.  Section 1982 provides that all persons shall have the same right enjoyed by white citizens specifically with respect to real and personal property.  *See* 42 U.S.C. § 1982.  Furthermore, Plaintiffs alleged violations of two separate components of the Fair Housing Act ("FHA").  The FHA makes it unlawful to refuse to sell or rent to individuals because of their religion, *see* 42 U.S.C. § 3604(a), and to coerce, intimidate, threaten, or interfere with a person's enjoyment of housing rights, *see* 42 U.S.C. § 3617.

The Delegates contend that summary judgment is appropriate on these counts because the Delegates, as individuals, never had the authority to issue or to deny building permits.  *See* ECF 199-1 at 24–25.  However, the cases they have cited do not support their argument.  For example, in *Edwards v. Johnson County Health Dep't*, 885 F.2d 1215 (4th Cir. 1989), black migrant farmworkers alleged that the issuance of state permits violated the FHA.  The farmworkers alleged that the county health department issued permits even though facilities did not comply with

---

[10] In any event, this Court denied summary judgment on these counts with respect to the County Defendants. *See OT, LLC v. Harford County, Maryland*, No. GLR-17-2812, 2019 WL 4598009 (D. Md. Sep. 23, 2019). Since Plaintiffs have established genuine questions of material fact as to the existence of an underlying conspiracy, the conduct of the County Defendants are imputed to them at this stage. *Cf. Yates v. Hagerstown Lodge No. 212*, 878 F.Supp. 788, 803 (D. Md. 1995) ("Yates need not plead an overt act against each defendant since a single act by one conspirator may sustain a conspiracy claim.").

applicable state health and safety standards. *See id.* at 1217. In rejecting the appellants' § 3604 claims, the court explained that issuance of permits, by definition, did not *deprive* individuals of housing. *See id.* at 1222 ("Such a contention would plainly be false for appellees' issuance of state permits actually helped make *available* migrant housing facilities") (emphasis in original). Here, by contrast, the Delegates are not alleged to have made housing available in any capacity. Instead, Plaintiffs have provided evidence that the Delegates conspired with Harford County officials to derail the Old Trails housing project entirely.

*Painter's Mill Grille v. Brown*, 716 F.3d 342 (4th Cir. 2013), is similarly inapposite. In that case, the plaintiff leased property from a landlord to operate a restaurant. The plaintiff alleged that the landlord became increasingly hostile because of the race of the restaurant's clientele. *Id.* at 345. For example, the landlord made racially-charged comments about the customers, arbitrarily charged rent, and refused to allow signage to advertise the restaurant. *Id.* at 346. Additionally, when the restaurant sought to assign its lease to another establishment, the plaintiff alleged that the landlords not only withheld their consent, but also made derogatory comments in hopes of obstructing the deal. *Id.* at 350. On appeal, the court explained that establishing a § 1981 claim required both possessing and exercising enough authority to interfere with the individual's ability to obtain contracts with third parties. *See id.* at 351. In that scenario, any suggestion that the landlords were exercising their authority to interfere with the potential lease assignment was belied by the fact that the landlords had already consented to the arrangement. *Id.* In this case, there is no similar mitigating component to the Delegates' alleged conduct, because they took no action to support Plaintiffs' Old Trails project in any capacity. When this Court draws inferences in Plaintiffs' favor, they have established questions of material fact about whether the Delegates,

by conspiring with County officials, interfered with their ability to contract for housing at Old Trails.

## F. *Noerr-Pennington* Doctrine

The Delegates' last-ditch effort is invocation of the longstanding *Noerr-Pennington* Doctrine. The *Noerr-Pennington* Doctrine "safeguards the First Amendment right to 'petition the government for a redress of grievances.'" *Waugh Chapel S., LLC v. United Food and Commercial Workers Union Local 27*, 728 F.3d 354, 362 (4th Cir. 2013) (quoting U.S. Const. amend. I). The Delegates suggest that this doctrine shields their conduct from civil liability. As an initial matter, the Delegates concede that the Fourth Circuit has not extended *Noerr-Pennington* to bar federal civil rights claims. *See* ECF 199-1 at 26; *see also Waugh Chapel*, 728 F.3d at 362–63 (explaining that *Noerr-Pennington* arose in the context of antitrust law).

Nonetheless, the persuasive authority that the Delegates rely upon provides no further support for application of the doctrine here. For example, in *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852 (5th Cir. 2000), two families had a longstanding feud regarding the plaintiff's sand pit business known as Bayou Fleet. *Id.* at 854. The plaintiff alleged that the defendant, a Council member for the Parish, had conspired with the other family to persuade authorities to stop issuing permits for Bayou Fleet's operations. *Id.* The Council member took numerous steps to halt Bayou Fleet's operations, including arguing before a local Zoning Committee, and proposing new resolutions to the Parish Council. *See id.* at 855–56. Even so, the Fifth Circuit concluded that *Noerr-Pennington* applied to the Council Member's actions. *Id.* at 862 (stating the doctrine "applies to all genuine lobbying efforts, despite subjective intent and the net effects on a competitor's First Amendment rights."). Here, Plaintiffs have provided evidence that the Delegates' conduct did not consist of "genuine lobbying efforts." For instance, a reasonable jury

could perceive Impallaria's conversation with Dr. Younus as a threatening and intimidating effort to silence *his* speech. In addition, genuine factual questions exist about whether the Delegates (1) threatened County officials and/or (2) leveraged their positions to coerce officials into withholding permits for Old Trails. The nature of the Delegates' alleged conduct differentiates their activity from that of officials who have successfully invoked *Noerr-Pennington* in the past. *See, e.g.*, *Kearney v. Foley & Lardner*, 590 F.3d 638 (9th Cir. 2009) (applying the doctrine to government officials representing a school in an eminent domain proceeding, but remanding based on the "sham" exception); *New West v. City of Joliet*, 491 F.3d 717 (7th Cir. 2007) (remanding to consider the doctrine in the context of a city's lobbying efforts to condemn an apartment complex).

## G. State Law Claims[11]

### 1. State Law Immunity (Counts VIII, IX, XVII)

The Maryland Code provides that a member of the state legislature "who, in good faith, provides a constituent service is not civilly liable for any act or omission related to the constituent service and within the scope of the public duties of the member." Md. Code, Courts and Judicial Proceedings, § 5-525(b). As described above, genuine questions of material fact exist about whether the Delegates conspired with County officials to prevent the construction and purchase of homes, because of the religious identity of the prospective occupants. Thus, genuine factual questions exist about whether the Delegates' actions were done in good faith and within the scope of their public duties.

### 2. Maryland Declaration of Rights (Counts VIII and IX)

Maryland courts interpret Article 24 *in pari materia* with its federal counterparts, *i.e.*, the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Allmond v. Dep't of Health*

---

[11] Since Plaintiffs do not oppose entry of summary judgment with respect to Judicial Review of Administrative Acts, ECF 204 at 20 n.15, the Court grants summary judgment to the Delegates on Count XVI.

*and Mental Hygiene*, 141 A.3d 57, 67 (Md. 2016). Although Maryland courts have not explicitly held that Article 36 is interpreted *in pari materia* with the First Amendment, *but see Booth v. Maryland*, 337 F. App'x 301, 311 (4th Cir. 2009) ("Maryland state courts have proceeded on the basis that even if Article 36 does provide for a private cause of action, Article 36 and the First Amendment of the United States Constitution have the same effect."), the Delegates' arguments are, nevertheless, based on the federal Constitution. *See* ECF 199-1 at 31 ("Because Maryland courts interpret these constitutional tort claims in parallel with 42 U.S.C. § 1983 claims, [Defendants] are entitled to judgment for the reasons discussed above."). Accordingly, for the reasons I have discussed above, summary judgment is denied.[12]

### 3. Tortious Interference (Count XVII)

A claim for tortious interference with prospective business relations, under Maryland law, requires showing: (1) intentional and willful acts (2) calculated to cause damage to the plaintiffs in their lawful business that are (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants, and (4) that cause actual damage. *Volcjak v. Washington Cty. Hosp. Ass'n*, 723 A.2d 463, 512 (Ct. Sp. App. Md. 1999). Moreover, the interference must be "accomplished through improper means." *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 641–42 (Ct. Sp. App. Md. 2005). Importantly, the *Spengler* court noted that violations of applicable federal law "might well establish liability under the tortious interference theory." *Id.* at 643 (alleging that Sears violated the Fair Credit Reporting Act). Plaintiffs' showing, with respect to the underlying conspiracy, is sufficient to demonstrate genuine issues of material fact regarding the elements of this claim. For example, a jury could reasonably find that the Delegates' joint letter, if based on discriminatory motive, satisfies all four components. And, with

---

[12] This Court notes that the question of whether Article 36 of the Maryland Declaration of Rights provides a private cause of action is undecided. *See Booth v. Maryland*, 337 F. App'x 301, 311 (4th Cir. 2009).

respect to "improper means," as noted above, genuine questions of material fact exist about whether the Delegates have violated several federal laws in the course of their relevant conduct.

Furthermore, a claim for tortious interference with contract requires that the defendant know of an existing contract and engage in improper conduct to induce a third party's breach of that contract. *Mixter v. Farmer*, 81 A.3d 631, 638 (Md. 2013); *see also TKA Inc. v. Bowers*, 2019 WL 517209, at *5 (Ct. Sp. App. Md. 2019) (listing elements of a claim for tortious interference with contract). The Delegates contend that there is no evidence that a contract was breached or terminated, and thus, Plaintiffs cannot establish a necessary element of their claim. However, by drawing all reasonable inferences in Plaintiffs' favor, I find that a jury could reasonably conclude that the Delegates interfered with several contracts, including: (1) the arrangement between Gemcraft; and S&S and (2) agreements between Gemcraft and numerous homebuyers. Accordingly, summary judgment is denied on the tortious interference claims.

## IV. CONCLUSION

For the reasons set forth above, the Delegates' Motion for Summary Judgment, ECF 199, is GRANTED in part and DENIED in part. A separate Order follows.

Dated: October 24, 2019

_____
/s/
Stephanie A. Gallagher
United States District Judge
